AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the
District of Colorado

| | |
|---|---|
| In the Matter of the Search of | ) |
| | ) |
| Precise Location Information And Data/GPS | ) |
| Information On Cellular Telephone Assigned | ) |
| Call Number: (561) 900-8603 | ) |
| | ) |

Case No.  22-sw-00760-KLM

## APPLICATION FOR A SEARCH WARRANT

I am a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property

**SEE "ATTACHMENT A"**, which is attached to and incorporated in this Application and Affidavit

located in the _____ State and _____ District of _____ New Jersey _____, there is now concealed *(identify the person or describe the property to be seized)*:

**SEE "ATTACHMENT B"**, which is attached to and incorporated in this Application and Affidavit

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☒ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☒ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1347 and 18 U.S.C. § 1349 | Health Care Fraud and Conspiracy to Commit the Same |
| 42 U.S.C. § 1320a-7b(b) and 18 U.S.C. § 371 | Offering Illegal Bribes and Conspiracy to Commit the Same |
| 18 U.S.C. § 220 | Payment For Referrals To Laboratories For Services Paid For By A Health Care Benefit Program |

The application is based on these facts:

- ☒ Continued on the attached affidavit, which is incorporated by reference.
- ☒ Delayed notice of _____ days (give exact ending date if more than 30 days: _September 5, 2022_ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*s/ Cory Rumple*
_____
*Applicant's signature*

Special Agent Cory Rumple
Department of Health and Human Services
_____
*Printed name and title*

Sworn to before me and: ☐ signed in my presence.
☒ submitted, attested to, and acknowledged by reliable electronic means.

Date:  **23 Jun 2022**
_____

_____
*Judge's signature*

City and state:  _Denver, CO_

Kristen L. Mix
United States Magistrate Judge
_____
*Printed name and title*

## **ATTACHMENT A**

### **Property to Be Searched**

This warrant applies to records and information associated with the cellular device assigned call number 561-900-8603, with IMSI 310260918904108, and listed subscriber A & E Czech Enterprises LLC (the "SUBJECT ACCOUNT"), that is in the custody or control of T-Mobile US, Inc., a wireless telephone service provider headquartered at 4 Sylvan Way, Parsippany, New Jersey 07054.

<u>**ATTACHMENT B**</u>

**Particular Things to be Seized**

**I.        Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of T-Mobile US, Inc. ("Provider"), including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the SUBJECT ACCOUNT listed in Attachment A:

A.  *Historical Information.* For the period from **March 1, 2022, to the present**:

    1.  The following information about the customers or subscribers of the SUBJECT ACCOUNT:

        i.  Names (including subscriber names, user-names, and screen names);

        ii.  Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

        iii.  Local and long-distance telephone connection records;

        iv.  Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

        v.  Length of service (including start date) and types of service utilized;

        vi.  Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

        vii.  Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

        viii.  Means and source of payment for such service (including any credit card or bank account number) and billing records.

    2.  All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the SUBJECT ACCOUNT, including:

        i.  the date and time of the communication, the method of the communication, and the source and destination of the communication

(such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

    ii.  all historical location information: including data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the Account, along with Per Call Measurement Data (PCMD), Network Element Locator Service (NELOS), Real Time Tool (RTT), Timing Advance Data, or other precise historical handset data.

3. The Provider shall deliver the information set forth above within **7 days** of the service of this warrant.

B. *Prospective Location Information.* The Provider shall provide all prospective location information about the location of the SUBJECT ACCOUNT described in Attachment A for a period of thirty days, during all times of day and night. The thirty-day period commences at the time of service of this warrant on the Provider, or 14 days from the issuance of this warrant, whichever comes first. "Information about the location of the SUBJECT ACCOUNT" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone described in Attachment A. To the extent that the location information is within the possession, custody, or control of Provider, Provider is required to disclose the Location Information to the government. Requested information further includes:

1. Records of user activity for each connection made to or from the Accounts, including log files; messaging logs; the date, time, length, and method of connections; data transfer volume; user names; and source and destination Internet Protocol addresses;

2. Information about each communication sent or received by the Accounts, including the date and time of the communication, the method of communication, and the source and destination of the communication (such as source and destination email addresses, IP addresses, and telephone numbers);

3. All data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from each cellular telephone or device assigned to the Accounts, to include all voice, SMS, MMS, and data activity; and

4. All records containing round-trip-distance measurements and/or timing advance information for ach connection made to or from the Accounts (GSM, CDMA, EVDO, UMTS, LTE, etc.), to include NELOS, RTT, True Call Measurement Data, PCMD records, and Reveal Reports.

In addition, Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with Provider's services, including by initiating a signal to determine the location of the SUBJECT ACCOUNT on Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government.

C. *Pen register/trap and trace information.* Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information and accomplish the installation of the pen register / trap and trace device under 18 U.S.C. § 3124. Provider shall also make available information associated with each communication to and from the SUBJECT ACCOUNT for a period of thirty days from the date of this warrant. The thirty-day period commences at the time of the service of this warrant on the Provider, or 14 days from the issuance of this warrant, whichever comes first. This information includes:

   1. Any unique identifiers associated with the cellular device;

   2. Source and destination telephone numbers;

   3. Date, time, and duration of communication; and

   4. All data about the cell towers (i.e., antenna towers covering specific geographic areas) and sectors (i.e., faces of the towers) to which the SUBJECT ACCOUNT will connect at the beginning and end of each communication as well as per-call measurement data (also known as "real-time tool" or "RTT").

D. This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

## II.    Information to Be Seized by the Government

All information described above in Section I that constitutes evidence and instrumentalities of violations of 18 U.S.C. § 1347 (health care fraud), 18 U.S.C. § 1349 (conspiracy to commit a Title 18 offense, namely health care fraud), 42 U.S.C. § 1320a-7b(b) (soliciting/receiving or offering/paying illegal kickbacks and bribes in exchange for a health care referral for services paid for by Federal health care program (e.g., Medicare and Medicaid)), 18 U.S.C. § 371 (conspiracy to commit an offense against the United States, specifically soliciting/receiving and offering/paying illegal kickbacks and bribes), and 18 U.S.C. § 220 (the Eliminating Kickbacks in Recovery Act, prohibiting payment for referrals to laboratories for services paid for by a health care benefit program, which includes private insurance)—together, the "SUBJECT OFFENSES"— involving ADAM SHORR, RONALD KING, and VICTOR ROITER.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, CORY RUMPLE, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.    I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the following cellular telephones (the "Target Cell Phones"):

      a.    Cellular telephone with assigned call number (561) 900-8603, with service provider T-Mobile US, Inc., a wireless telephone service provider headquartered at 4 Sylvan Way, Parsippany, New Jersey 07054.

      b.    Cellular telephone with assigned call number (603) 915-6213, with service provider Verizon Wireless, a wireless telephone service provider headquartered at 180 Washington Valley Road, Bedminster, NJ 07921.

      c.    Cellular telephone with assigned call number (908) 770-0398, with service provider Verizon Wireless, a wireless telephone service provider headquartered at 180 Washington Valley Road, Bedminster, NJ 07921.

2.    The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of applications for search warrants under 18 U.S.C. § 2703(c)(1)(A) to require T-Mobile US, Inc. ("T-Mobile") and Verizon Wireless to disclose to the government copies of the information further described in Attachment B to each requested warrant. Upon receipt of the information described in each respective Attachment B, government-authorized persons will review the information to locate items described in Section II of Attachment B.

3.    Because this warrant seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), the

requested warrant is designed to also comply with the Pen Register Act.  *See* 18 U.S.C. §§ 3121–3127.  The requested warrant therefore includes all the information required to be included in an order pursuant to that statute.  *See* 18 U.S.C. § 3123(b)(1).

4.     I am a Special Agent with the Department of Health and Human Services, Office of Inspector General (HHS-OIG) and have been since May 2015. Prior to that, I was a Special Agent with the U.S. Environmental Protection Agency, Office of Inspector General (EPA-OIG). I was a Special Agent with EPA-OIG for approximately ten years. I have conducted investigations involving health care fraud, public corruption, grant and contract fraud, and wire and mail fraud. I have also completed numerous fraud investigation trainings. I have a Bachelor of Science in Criminal Justice and a Master of Arts in Legal Studies. I am also a member of the Guardians Task Force through the U.S. Department of Justice, created to investigate violations of criminal statutes involving tribal nations. As a Special Agent with HHS-OIG, I investigate criminal violations of, inter alia, 18 U.S.C. §§ 1347 and 1349 and 42 U.S.C. § 1320a-7b. As part of my training and experience, I have participated in investigations involving electronic evidence, e-mails, text messages, and the Internet.

5.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6.     Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 1347 (health care fraud), 18 U.S.C. § 1349 (conspiracy to commit a Title 18 offense, namely health care fraud), 42 U.S.C. § 1320a-7b(b) (soliciting/receiving or

offering/paying illegal kickbacks and bribes in exchange for a health care referral for services paid for by Federal health care program (e.g., Medicare and Medicaid)), 18 U.S.C. § 371 (conspiracy to commit an offense against the United States, specifically soliciting/receiving and offering/paying illegal kickbacks and bribes), and 18 U.S.C. § 220 (the Eliminating Kickbacks in Recovery Act, prohibiting payment for referrals to laboratories for services paid for by a health care benefit program, which includes private insurance)—together, the "SUBJECT OFFENSES"—have been committed and are being committed by **ADAM SHORR, RONALD KING,** and **VICTOR ROITER,** as well as other coconspirators known and unknown to the United States.  There is also probable cause to believe that the location information described in Attachment B will identify the location where these individuals work and, therefore, where evidence and instrumentalities of their crimes, including phones and computers used to conduct the scheme, are located.

7.    The Court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711.  Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

## **PROBABLE CAUSE**

### **Summary**

8.    The United States, including the Department of Health and Human Services, Office of the Inspector General, the Federal Bureau of Investigation, and the Internal Revenue Service-Criminal Investigations, is conducting a criminal investigation of **SHORR, KING, ROITER**, and others regarding possible violations of the SUBJECT OFFENSES. These

3

individuals own and/or operate, with others, Tesis Biosciences LLC, and its subsidiaries and related entities, including Claro Scientific Laboratories Corp., Claro Scientific Laboratories, Inc., Claro Point, LLC, Claro Labs, and Tesis Labs Colorado (collectively, the Claro/Colorado entities are referred to as "Claro"), and Alliance DX, LLC and its related entities (collectively, "Alliance"), to execute a fraudulent genetic testing scheme that also involves the payment of illegal kickbacks for health care referrals. These entities are controlled by the same set of individuals, and hereinafter, the Claro, Alliance, and Tesis, entities are collectively referred to as "Tesis."

9.      In summary, the scheme involves recruitment of Medicare and Medicaid beneficiaries and some private insurance patients (collectively, hereinafter, the "beneficiaries"), to receive medically unnecessary genetic tests run on buccal (cheek) swabs collected from the beneficiaries. Tesis pays marketing companies to recruit beneficiaries to agree to submit to genetic testing, to obtain a medical requisition form (or doctor's order) from an enrolled healthcare provider for the genetic tests, then to refer those beneficiaries with the associated requisition to Tesis. Tesis purchases the referrals and doctors' orders from the marketing companies, and it bills insurance, including Medicare and Medicaid programs, for genetic tests performed on the swabs from the referred beneficiaries. There is probable cause to conclude that (1) payments from the lab entities to marketing companies are illegal health care kickbacks, and (2) submission of claims to Medicare and Medicaid for payment of the tests constitutes health care fraud because the claims are submitted in violation of Medicare and Medicaid coverage laws and regulations.

4

10.     The following individuals, as well as other coconspirators known and unknown to the government, direct and participate in the scheme:

a.     **Ronald King** ("KING"), the CEO of Tesis and COO of BrightDrive HCS ("BrightDrive"), a medical administration and billing company that participates in directing activities of the Tesis entities;

b.     **Victor Roiter** ("ROITER"), who is identified as having various roles with the Tesis entities, including as Vice President of Sales and Development, "owner" of Claro Scientific Laboratories Corp., and a Medicare "Authorized Official" for Alliance;

c.     **Adam Shorr** ("SHORR"), an intermediary between the Tesis entities and the marketing companies that recruit the beneficiaries to submit to genetic testing, as well as the operator of an entity (A & E Czech Enterprises LLC) in the name of his wife that owns shares of Tesis; and

d.     Tina Wellman, identified at one time as COO of Claro and currently as the Vice President of Billing, and the owner and CEO of BrightDrive HCS.

11.     There is probable cause to conclude that SHORR, KING, and ROITER participate in the scheme by directing Tesis activities from separate, decentralized locations, including their primary residences, through their cellular telephones, electronic devices, and otherwise. Evidence indicates that each subject uses the cellular phone number identified below through the identified PROVIDER, and from the following locations, as instrumentalities of the scheme.

**SHORR**, phone number **561-900-8603** with provider **T-Mobile**.

- The United States obtained a search warrant for SHORR's e-mail address (adam_shorr@yahoo.com) (warrant signed January 10, 2022), which he used to send e-mails regarding the Tesis business and to other Tesis principals and

employees, including KING and ROITER. Review of the data returned by the provider is ongoing, but the data identified under the warrant to date shows that SHORR regularly includes a signature block on e-mails he sends regarding the scheme that list his name and "Mobile 561 900 8603".

- A review of IP address logs obtained pursuant to the same search warrant show the account user utilized a cellular connection on T-Mobile's network to access the e-mail account between approximately January 10, 2021, and January 10, 2022 (the date through which records were provided). The provider for 561-900-8603 is T-Mobile.

- The contacts list associated with the SHORR e-mail address identifies ROITER and KING with the phone numbers below, as well as other Tesis employees and individuals linked to the Tesis business.

- On or about March 12, 2022, T-Mobile provided subscriber information for phone number 561-900-8603 in response to a court order pursuant to 18 U.S.C. § 2703(d). The name on the account for this phone number is A & E Czech Enterprises LLC ("A & E Czech") with an address of 3373 Covered Bridge Dr. W, Dunedin, FL 34698 USA, beginning service date of January 16, 2018. A & E Czech is a shareholder in Tesis, as explained below, and review of the e-mail records and other information gathered to date indicates that SHORR conducts business for the Tesis scheme, although A & E Czech is registered in is wife's name. SHORR confirmed in one e-mail that A& E is an umbrella for other business run by himself and his wife and that "A&E owns large percent of Tesis."

- T-Mobile produced toll records for the period December 1, 2021, through March 8, 2022, for phone number 561-900-8603. Those records indicate the following: SHORR's sixth top contact (based on number of phone calls) was KING, and his eighth top contact was Joseph Zoccali, owner of a marketing company that contracted with Tesis and has been paid over $1.5 million from Claro's bank account. The records reflect there were also over 200 calls between SHORR and ROITER, at the cellular telephone number listed below for ROITER.

- Evidence indicates SHORR resides at 3378 Clarine Way West, Dunedin, FL 34698. On April 11, 2022, agents surveilled the residence, located in a gated community requiring PIN access, and identified cars registered to SHORR and his wife, Erika Shorr, parked at the residence. This address is identified as the address for A & E Czech on a list Tesis provided its bank in January 2021 identifying its shareholders. This address is also listed on SHORR's bank account for his company, CHM Marketing Strategies, as of February 2022 (the date through which the government has records). In August 2021, SHORR deposited a check from the United States Treasury for an advanced child care tax credit, issued to Adam and Erika Shorr, at the Clarine address. The address on the personal

6

account into which SHORR deposited this check also identifies the Clarine address.

KING, phone number **603-915-6213** with provider **Verizon.**

- As noted above, the United States obtained a search warrant for SHORR's Yahoo! e-mail account. The data produced in response to that warrant includes a contacts list associated with the SHORR e-mail account, which lists KING with the phone number 603-915-6213.

- E-mails obtained pursuant to the same SHORR e-mail search warrant include e-mails from KING, which have a signature block that includes his phone number. For example, on or about July 29, 2020, rking@tesislaboratory.com sent an e-mail with what appears to be a signature block that reads, "Thanks Ron 603-915-6213". In another document recovered during the same e-mail search warrant, on or about June 28, 2020, KING appears to have electronically signed an application for funding for Claro Scientific Laboratory that reads on the first page, "Pharma Funding", "Application Package", "Cash Flow Solutions for Growing Health Care Service Providers." The application lists "Ron King" as the main contact and "CEO" for Claro Scientific Laboratory with a phone number of 603-915-6213.

- On or about April 1, 2022, Verizon provided subscriber information for phone number 603-915-6213 in response to a court order issued pursuant to 18 U.S.C. § 2703(d). A review of the subscriber information for phone number 603-915-6213 indicates the name on the account is Ronald A. King, with address 120 N SOUTH RD UNIT C, NORTH CONWAY, NH (the address for a UPS Store), and a beginning service date of March 11, 2013.

- Verizon produced toll records for the period December 1, 2021, through March 8, 2022, for phone number 603-915-6213. Those records indicate the following: KING's top contact (based on number of calls) was Dana Dittus, Chief Operating Officer of Tesis; his second top contact was Bradley Edson, one of the individuals with financial control over Tesis accounts; his fourth top contact was ROITER, at the number listed below; and his fifth top contact was Tina Wellman. Records reflect that KING and SHORR contacted each other by voice call just eight times, but they texted over 100 times during the period provided.

- The United States obtained a search warrant for KING's e-mail addresses (rking@tesislaboratory.com and rking@brightdrivehcs.com) (signed March 28, 2022), which he uses to send e-mails regarding the Tesis business and to other Tesis principals and employees, including SHORR and ROITER. Review of the data returned by the provider shows the user of the two e-mail accounts was using a cellular connection on Verizon's network to access the e-mail accounts. The dates were not provided in the IP logs, but the search warrant requested data up to March 2022. The provider for 603-915-6213 is Verizon.

7

- Evidence indicates KING resides at 8 Grandview Dr, Berlin, NH 03570. A copy of KING's New Hampshire driver's license reveals that KING renewed this license on February 24, 2022. The new license has an address for KING at the Grandview address. On or about April 6, 2022, law enforcement conducted surveillance at 8 Grandview Drive, Berlin, New Hampshire, at around 1:30 pm. At this time, there were two pickup trucks parked in the driveway at said location. There were also two workers outside of this location doing some sort of construction, and both garage doors of the residence were ajar. There was a red Toyota 4 Runner parked to the right side of this residence near a trailer. The license plate on this 4 Runner was too far away to read, but KING has two vehicles currently registered him, one of which is a 2018 red Toyota 4 Runner with New Hampshire registration. In-person surveillance at this address is very difficult due to the location of the residence, which is rural and wooded. The home is located at the top of a mountain at the end of a long driveway, and the home is surrounded by trees. It is difficult to view the property up close without driving onto it.

- Records from a business account KING controls that appears to be used for his personal expenditures (e.g., restaurant purchases, etc.) show that the debit card associated with the account most often makes purchases in New Hampshire and New York. There is an office for BrightDrive in Schoharie, New York.

**ROITER**, phone number **908-770-0398** with provider **Verizon**.

- As noted above, the United States obtained a search warrant for SHORR's Yahoo! e-mail account. The data produced in response to that warrant includes a contacts list associated with the SHORR e-mail account, which lists ROITER at 908-770-0398.

- E-mails obtained pursuant to the same SHORR e-mail search warrant include e-mails from ROITER. On or about June 29, 2020, ROITER appears to have electronically signed an application for funding for Claro Scientific Laboratory, a copy of which is located in SHORR's e-mails, that reads on the first page, "Pharma Funding", "Application Package", "Cash Flow Solutions for Growing Health Care Service Providers". The application lists "Victor Roiter" as "V.P." and an 11% owner of Claro Scientific Laboratory with a phone number of 908-770-0398.

- On or about April 1, 2022, Verizon provided subscriber information for phone number 908-770-0398 in response to a court order issued pursuant to 18 U.S.C. § 2703(d). A review of the subscriber information for phone number 908-770-0398 indicates the name on the account is a business name of Nevins Pharmacy, with an individual name listed as "Victor-FULL Access.", and an address of 56 E PARSONAGE WAY MANALAPAN, NJ and beginning service date of March 1,

8

2013. Lexis Nexis has the Parsonage Way address listed as a former address associated with ROITER.

- Verizon also produced toll records for the period December 1, 2021, through March 8, 2022. Those records indicate the following: ROITER's top contact (based on number of phone calls) was Philip Visicaro, who has received over $2 million from Tesis into his PF Consultants LLC bank account, which then pays out funds to entities associated with those involved with Tesis, including KING, ROITER, and Wellman; his second top contact was KING, at the number listed above; his third top contact was Ethan Roiter, who is believed to be ROITER'S relative, potentially his son, and who receives money from ROITER; his fourth top contact was Vilson Kolaj, associated with entity Rook, LLC, which has received almost $3 million from Tesis accounts (between August 20, 2020, and October 6, 2021, when the account was closed) into a bank account on which ROITER was a signatory for a portion of that time; his seventh top contact was Dana Dittus, the Chief Operating Officer for Tesis, according to the Tesis website; his ninth top contact was SHORR, at the number listed above; and his tenth top contact was Tina Wellman.

- On March 22, 2022, an undercover agent ("UC") called ROITER on phone number 908-770-0398. During the call, the UC advised ROITER that he owned a marketing company involved in doing genetic testing. ROITER discussed entering into a contract with the UC's company to provide beneficiary swabs for genetic testing to ROITER's labs.

- Evidence indicates ROITER resides at Trump Tower I, 16001 Collins Avenue, Sunny Isles Beach, FL 33160. A search of the Florida Driver and Vehicle Information Database revealed ROITER has a valid driver's license issued on October 13, 2020, with an address of 16001 Collins Ave., Apt 3104, Sunny Isles Beach, FL 33160-5545. On April 5, 2022, agents conducted surveillance and spoke with management at Trump Tower I. Management confirmed that ROITER is the resident of unit 3104. In-person surveillance at this residence is prohibitive. Management informed the agents that no persons are admitted past the lobby to the residences without approval of a resident or a court order. Parking for Trump Tower I is in an underground, gated facility to which there is no entry to nonresidents.

12. The United States has not identified any Tesis offices in Florida, New Hampshire, or New York. As established below, the scheme is accomplished significantly through electronic communications and data, including e-mail communication, phone calls, and text messages, which the evidence above indicates the subjects accomplish in separate, remote locations,

including their primary residences. In my experience, individuals regularly keep their cell phones near them or on their person, and businesspeople who work remotely often use portable electronic devices, like laptop computers, to send e-mails and transact business from their work locations, which in a remote work environment often includes the home. Based on this information and that set forth above, it is reasonable to believe the individuals listed are the users of the phone numbers listed, and for the reasons stated above and set forth below regarding the scheme, the associated phones are instrumentalities of the offenses and likely contain evidence of the SUBJECT OFFENSES, including but not limited to e-mail, text messages and other communications. Because phones are carried on one's person, it is also likely that the location of the phones will identify the location of the places where the subjects work and create electronic data that is evidence of the SUBJECT OFFENSES. There is also probable cause to believe that knowing the historical and prospective precise location of the phones identified will assist law enforcement in safely locating and seizing the phones and other evidence and instrumentalities of the offenses.

13.    The information below sets forth probable cause regarding the SUBJECT OFFENSES and identifies the subjects' use of electronic communications and data to accomplish them.

**Legal Background**

14.    Based upon my training and experience, my participation in this investigation, and information received from law enforcement officers and others, I have learned, among other things, the following regarding the Medicare program:

a.    Medicare is a federal health care program providing benefits primarily to persons who are 65 years of age or older or who are disabled. Medicare is administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency within the United States Department of Health and Human Services. Individuals who receive benefits under Medicare are referred to as Medicare "beneficiaries." Medicare provides medical insurance coverage for medical services provided by physicians, medical clinics, laboratories, and other qualified and enrolled health care providers.

b.    "Providers" include clinical laboratories, physicians, and other health care providers who provide services to beneficiaries. To be eligible to bill Medicare, a provider must submit an enrollment application to Medicare. The enrollment application contains certification statements that the provider must agree to before enrolling with Medicare. The certification statement sets forth, in part, that the provider agrees to abide by the Medicare laws, regulations, and program instructions and will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare.

c.    Under Medicare regulations, a medical provider is permitted to submit claims only for services actually rendered and is required to maintain patient records verifying the provision of services.

d.    To receive reimbursement for a covered service from Medicare, a provider is required to submit a claim., either electronically or in writing. The claim must include information identifying the medical provider submitting the claim, the medical provider rendering the service, the referring provider, the patient, and the services rendered. As a condition of payment, Medicare requires providers to certify that all information on a

11

claim is true, correct, and complete. Additionally, the provider must certify that the service was rendered personally by the provider or under his/her direct supervision and incident to the provider's care, and that the service was medically necessary for the health and/or wellbeing of the patient.

e.       One component of Medicare, referred to as "Part B," covers the costs of services including laboratory testing. Medicare covers these costs only if, among other requirements, the relevant services are reasonable, medically necessary, and ordered by a physician.

f.       Except for certain statutory exceptions, Medicare excludes from coverage tests "that are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 C.F.R. 411.15S(k)(l). If laboratory testing is necessary for the diagnosis or treatment of illness or to improve the functioning of a malformed body member, Medicare imposes additional rules to require that testing, including diagnostic laboratory testing "must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem. Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary." 42 C.F.R. § 410.32(a).

g.       Medicare does not reimburse claims for services if they were procured through the payment of kickbacks or bribes. Such claims are deemed false and fraudulent because they violate Medicare laws, regulations, and program instructions, and violate

criminal law. For example, where a genetic test is procured through payment of a kickback in violation of the Antikickback Statute, a claim to Medicare for reimbursement of that test is fraudulent.

h.      The Medicare Advantage Program provides another way for Medicare-eligible individuals to get health coverage. Medicare Advantage Plans, sometimes called "Part C" or "MA Plans," are offered by Medicare-approved private companies that must follow rules set by Medicare. Private health insurance companies offering Medicare Advantage plans must provide beneficiaries with the same services and supplies offered under Medicare Parts A and B. Companies like Humana, Inc., Aetna, Inc., United Health Group, Inc., and other private companies, along with their related subsidiaries and affiliates, contract with CMS to provide care to Medicare Advantage beneficiaries through various plans. The private companies providing Medicare Advantage plans are paid a fixed rate per beneficiary per month by Medicare, regardless of the actual number or type of services the beneficiary received. When submitting a claim to a Medicare Advantage plan, the provider certifies that the form was prepared in compliance with laws and regulations governing Medicare. Providers also certify that the services being billed were medically necessary and provided as billed.

i.      Medicare is a "Federal health care program" as defined in 42 U.S.C. § 1320a-7b(f), and is a "health care benefit program," as defined by 18 U.S.C. § 24(b).

15.    Based upon my training and experience, my participation in this investigation, and information received from law enforcement officers and others, I have learned, among other things, the following regarding Medicaid programs:

13

a.      Medicaid provides health coverage to millions of Americans, including eligible low-income adults, children, pregnant women, elderly adults, and people with disabilities. Medicaid is administered by states, according to federal requirements. The program is funded jointly by states and the federal government.

b.      Every state has a Medicaid program, and each state program goes by a different name. Health First Colorado is the Colorado Medicaid Program (hereinafter "Colorado Medicaid"). Every Medicaid program is a public health insurance program that is jointly funded by state and federal funds. As such, all Medicaid programs are "Federal health care programs" as defined in 42 U.S.C. § 1320a-7b(f), and "health care benefit programs," as defined by 18 U.S.C. § 24(b).

c.      The Colorado Medicaid rules require that covered services be medically necessary, stating "[m]edical necessity means that a Medical Assistance program good or service is not primarily for the economic benefit of the provider or primarily for the convenience of the client, caretaker, or provider and is provided in accordance with generally accepted professional standards for health care in the United States." 10 Colo. Code Regs. § 2505-10:8.076.8.

d.      Laboratory services are a covered benefit only if specific conditions are met, including the following: (1) the services have been authorized by a licensed physician, (2) the services are performed to diagnose conditions and illnesses with specific symptoms, (3) the services are performed to prevent or treat conditions that are benefits under the Colorado Medicaid program, and (4) the services are not routine diagnostic tests performed without apparent relationship to treatment or diagnosis for a

14

specific illness, symptom, complaint or injury. 10 Colo. Code. Regs. § 2505-10:8.660.3.A(1)–(4).

16.    Genetic testing utilizes laboratory methods to analyze genes, which are a portion of one's hereditary DNA code that contributes to, among other things, one's phenotypic traits. Genetic tests can be used to identify health risks, such as a patient's risk for certain types diseases, including cancer and cardiovascular diseases, as the result of DNA mutations.

17.    One method of conducting genetic testing is to obtain a DNA sample from a patient using a cheek (buccal) swab that is sufficient to obtain a genetic profile. The DNA swab is submitted to a clinical laboratory for analysis. Following testing, the results should be sent back to the health care provider who ordered the testing and deemed the testing to be medically reasonable and necessary for treatment and diagnosis of the patient.

18.    There are many types of genetic testing. Cancer genomic ("CGx") testing uses DNA sequencing to detect mutations in genes that could indicate a higher risk of developing certain types of cancers in the future or to assist in the treatment of an existing cancer. CGx testing is not a method of diagnosing whether an individual presently has cancer. Cardiovascular genetic testing can identify genetic variants that can indicate an increased risk of developing certain cardiovascular conditions in the future and can assist in the treatment or management of a patient who presently has signs or symptoms of a cardiovascular disease or condition. Cardiovascular genetic testing is not a method of diagnosing whether an individual presently has a cardiac condition. Another type of genetic testing, pharmacogenomic (PGx) testing is a type of genetic test that assesses a patient's risk of an adverse response or likelihood to respond to a given drug. There are many other types of genetic testing that can identify the risk of developing

15

certain diseases or conditions in the future, including for example, Parkinson's, Alzheimer's, and diabetes. Genetic tests are not a method of diagnosing, in the first instance, whether an individual has a disease or condition.

19.    As for all diagnostic testing, Medicare covers genetic testing only in limited circumstances, such as when the beneficiary's treating physician deemed testing necessary for treatment and used the results in the management of the beneficiary's condition. Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary. For purposes of Colorado Medicaid, the test would only be covered if ordered to diagnose, prevent, or treat a condition and would not be covered if the test has no apparent relationship to treatment or diagnosis.

20.    Based on information learned through the investigation to date, there is probable cause to believe that genetic tests at issue in this investigation are not covered under Medicare or Colorado Medicaid because, inter alia, they are procured through the payment of kickbacks, there is no relationship between the tests and treatment of or diagnosis of a specific condition, and the tests are ordered primarily for the economic benefit of the patient recruiters/marketers and laboratories, due to the payment of kickbacks. Knowingly submitting and causing the submission of claims in violation of the Medicare or Medicaid coverage rules is health care fraud in violation of 18 U.S.C. § 1347, which prohibits schemes to defraud "health care benefit programs" as defined in 18 U.S.C. § 24(b). As noted, both Medicare and Medicaid are health care benefit programs.

21.    The payment of kickbacks, wherein a payment is offered/made and/or solicited/received, at least in part, in return for or to induce a referral, is illegal. For the reasons

16

outlined herein, there is also probable cause that illegal kickbacks were paid in a violation of 42 U.S.C. § 1320a-7b(b) and 18 U.S.C. § 220.

22.     The Federal Anti-Kickback Statute prohibits (1) the solicitation or receipt of "any remuneration" in return for "referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program," and (2) the offer or payment of "any remuneration" to induce a person to refer an individual for such purpose. 42 U.S.C. § 1320a-7b(b)(1)–(2). "Federal health care programs" are defined in 42 U.S.C. § 1320a-7b(f). As noted, Medicare and Medicaid programs are Federal health care programs within the meaning of the statute. Based on bank records received to date, Tesis has received payment from Colorado, Montana, and Wisconsin Medicaid programs.

23.     The Eliminating Kickbacks in Recovery Act ("EKRA"), 18 U.S.C. § 220, prohibits the offer, payment, solicitation, or receipt of any remuneration to induce a referral of an individual to a laboratory, or in exchange for an individual using the services of that laboratory. EKRA applies to services covered by a health care benefit program, in or affecting interstate or foreign commerce, as defined by 18 U.S.C. § 24(b). This generally includes most private insurance companies.

**Background on Tesis and Related Entities**

***Tesis***

24.     Tesis Biosciences, LLC is a Delaware entity that lists a registration date of October 17, 2019. Tesis Biosciences was previously known as Tesis Labs, LLC; Tesis publicly announced a name change to Tesis Biosciences in November 2021. Tesis has a website at

17

tesisbiosciences.com. As of May 2022 and prior thereto, the website identified "Tesis Headquarters" in Scottsdale, AZ, as well as locations in Denver, CO (1805 S. Bellaire Street, Denver, CO, an address for associated entity 303 Diagnostics, LLC, discussed below), Lafayette, CO (1408 Horizon Avenue, Suite 101, Lafayette, CO 80026, the address for Claro at that time), and Houston, TX (1140 Business Center Drive, Suite 360, Houston, TX 77043, the address then associated with Alliance). In or around June 2022, Tesis updated its website to identify the following locations: Arizona, at 8125 N 86th Place, Scottsdale, AZ 85258; Colorado, at 2953 S. Peoria Street, Suite 260, Aurora, CO 80014; and Texas, at 16115 Park Row, Suite 190, Houston, TX 77084. The "Leadership Team" identified on the website as of June 2022 includes, among others:

     a.    Ron King, CEO & Managing Board Member, "a seasoned health care executive with more than 25 years' experience in the healthcare industry."

     b.    Todd Stottlemyre, Managing Board Member, "a Co-Founder of Tesis."

     c.    Tina Wellman, Vice President of Billing, who "[f]rom the initiation of the company, [] has implemented and overseen the internal billing division and technology platform that allows Tesis to maximize effectiveness of its billing adjudication of insurance submissions."

     d.    Victor Roiter, Vice President of Sales. ROITER was listed on the website in this role as of March 2022, but when the website was visited in June 2022 he was removed from the website.

    25.    In January 2021, Tesis reported to its bank that Tesis Labs LLC was a company "structured to own multiple pharmacogenetic diagnostic lab testing facilities," with ownership at

that time of one lab in Colorado and one in Houston, Texas. As identified by Tesis, ownership of Tesis Labs LLC was shared amongst members holding Series A, B, and C units including the following: corporations owned or controlled by Todd Stottlemyre; A&E Czech Enterprises LLC, registered in the name of Erika Shorr, SHORR's wife (e-mail communications from SHORR indicate SHORR transacts business for Tesis on behalf of or using the A&E Czech entity); Redstone Consulting, controlled by ROITER; and Valley Vantage Consulting, LLC, controlled by Wellman.

*Claro*

26.     Claro Scientific Laboratories Corp. was an enrolled Medicare provider with CMS when Tesis purchased the lab in or around February 2020. On or about April 1, 2020, KING signed a "Medicare Participating Physician or Supplier Agreement" as CEO of Claro Scientific Laboratories Corp., accepting assignment of Medicare Part B payments with an effective date of February 5, 2020. Also on April 1, 2020, King signed an "Authorized Official Certification Statement," form 855B, as Claro's "Delegated Official." ROITER signed as the "Authorized Official Assigning this Delegation" on April 2, 2020. The Certification Statement states that his signature binds the company to the laws, regulations, and program instructions of the Medicare program. ROITER had previously signed an Authorized Official Certification with the same attestation on March 28, 2020, with an effective date of February 5, 2020. An employee of BrightDrive submitted these forms to CMS. These documents identified the address for Claro as the 1408 Horizon Avenue address that previously appeared on the Tesis website. On or about June 15, 2020, ROITER signed an "Electronic Funds Transfer (EFT) Authorization Agreement" on behalf of Claro, identifying the account holder for Claro funds as Claro Point, LLC.  The

Agreement identified the same Horizon Avenue address for Claro Point, LLC, and identified the contact person for questions regarding EFT as Ronald King, CEO. The same day, ROITER signed a second EFT Agreement listing Claro Scientific Laboratories Corp. and identifying himself as "Owner."

27.     Records Tesis provided to its bank in or around January 2021 for purposes of obtaining a business loan identify Claro Point, LLC and Claro Scientific Laboratories Corp. as subsidiaries of Tesis Labs, LLC and 100% owned by Tesis Labs, LLC. These same records identify the CEO for Tesis Labs, LLC as KING, the COO as Tina Wellman or Dana Dittus (both are so identified as COO in different Tesis documents), and the Vice President of Business Development as ROITER. The loan submission paperwork states BrightDrive is a company managing the operations, billing, and management for a number of testing laboratories, and Tesis entered into a contractual relationship with BrightDrive for the company to manage, operate, and administer its laboratories and provide billing services using BrightDrive's billing platform. BrightDrive agreed to provide these services without direct cost, in exchange for Series B units of the company. Tina Wellman identifies herself as the CEO and Owner of BrightDrive. E-mails from KING's BrightDrive e-mail identify him as the COO of BrightDrive.

28.     Claro Scientific Laboratories Corp. submitted claims to Medicare and certain state Medicaid programs. Medicare first paid Claro under the Part B program on June 12, 2020.  As of April 2022, the total amount Medicare had paid Claro under the Part B program is approximately $29,600,111 for claims with dates of service between April 21, 2020, and January 28, 2022. The submitted claims are associated primarily with procedure codes for genetic testing, including those pertaining to cardiac conditions, pharmacogenomic testing, cancer, and tests associated

20

with diagnoses of hypertension, shortness of breath, family history of cancer, and others. CMS records that Medicare Advantage (Part C) plans reported 1,051 encounters for 606 beneficiaries with Claro, between May 2020 and February 2022. The procedure codes associated with the encounters pertain primarily to codes for genetic testing, including those pertaining to cardiac conditions, pharmacogenomic testing, and cancer, and tests associated with diagnoses of hypertension, cardiomyopathy, major depressive disorder, and others.

29.    From January 1, 2020 (approximately one month before the Tesis acquisition of Claro), through December 31, 2021, Claro Scientific Laboratories Corp. submitted claims to Colorado Medicaid for $3,172,706.35, and Medicaid paid $1,414,730.83. Bank records currently available also reflect that Medicaid programs in Wisconsin and Montana paid Claro entities.

***Alliance***

30.    Alliance DX, LLC was an enrolled Medicare provider when Tesis acquired Alliance in or around November 2020. ROITER signed a CMS document titled "Electronic Data Interchange (EDI) Enrollment," on November 10, 2020, as Alliance's "Managing Partner" and the Authorized or Delegated Official for Alliance. BrightDrive is listed as Alliance's billing provider. According to Texas Secretary of State Records, Alliance is a Texas entity located in Houston with a listed address at 1140 Business Center Drive, as previously provided on the Tesis website.

31.    Bank records from the Bank of Oklahoma reflect that KING is a signatory on the Alliance bank accounts, and that he requested that the Alliance account be put on the "Tesis platform" so the Alliance bank accounts could be accessed with the Tesis accounts. KING began signing checks on behalf of Alliance in November 2020.

21

32.     As of April 2022, the total amount Medicare had paid to Alliance for Part B claims with dates of service from December 1, 2020 (approximating the date Tesis acquired the lab) through April 24, 2022, is over $17 million.  The submitted claims are associated primarily with procedure codes for genetic testing, including those pertaining to cardiac conditions, diagnoses of hypertension and others. CMS records that Medicare Advantage (Part C) plans reported 6,131 encounters for 2,343 beneficiaries with Alliance, DX, between January 2020 (approximately eleven months before Tesis's acquisition) and March 2022. The procedure codes associated with the encounters pertain primarily to codes for genetic testing, including those pertaining to cardiac conditions and cancer, and tests associated with diagnoses of hypertension, cancer, and others.

**Kickbacks and Health Care Fraud**

33.     As outlined below, there is probable cause to conclude that SHORR, KING, and ROITER, together and with others known and unknown to the United States, worked through and with Tesis and BrightDrive, to engage in fraudulent genetic testing and kickback schemes.

34.     During the course of this investigation, law enforcement interviewed and obtained information from Todd Shull, an individual who ran a marketing company, Sunrise Consulting Group ("SCG"). Shull worked with and received kickbacks from Tesis. Shull solicited beneficiaries to submit to genetic testing through a call center based in Florida. Shull obtained doctors' orders for genetic testing for beneficiaries and sold the samples with doctors' orders to Tesis. Shull worked with Tesis and its employees and representatives, communicating with them by e-mail, phone, and text message. In addition to documents he provided, Shull provided information that is included below through interviews with the government.

22

35.    Shull explained that employees of the call center contacted beneficiaries across the country via telephone, using a "script" to solicit the beneficiaries to agree to participate in genetic testing. These individuals were identified based on marketing data purchased by the call center or "live transfers" sent to the call center (which it appears were based at least in part on response to mass mailing campaigns targeting Medicare beneficiaries, and calls from recipients of the mass mailing). According to Shull, the call center employees spoke with beneficiaries and identified themselves as working for a company pertaining to health care, told them that a genetic test was available for them for free through their insurer, and convinced them to provide their insurance number and address to be sent a genetic testing kit. The call center employees did not explain that they worked at a call center. When a beneficiary agreed to submit to a genetic test, call center employees, including Shull, shipped out a kit to the beneficiary's home address that included a swab and instructions for the beneficiary explaining how to obtain a genetic sample from their cheek. The beneficiary would collect the genetic sample, then send the swab via a prepaid, labeled envelope to one of the Tesis labs for processing. Swabs sent to the Claro lab were shipped to Lafayette, Colorado. Records reflect that Claro outsourced (or "referenced")[1] the majority of the actual testing to a separate lab, Fulgent, while Claro submitted the claims to Medicare for reimbursement. In an e-mail Adam Shorr authored in November 2021, however, he stated that Tesis had stopped "outsourcing" to Fulgent and had begun doing "everything internally.. saving us tremendous $$". June 2022 surveillance of the new Claro location in

---

[1] A "reference laboratory" is a laboratory that receives a specimen from another laboratory and that performs one or more tests on such specimen. CMS's Medicare rules require laboratories to perform in-house at least 70 percent of what is billed to Medicare and refer to another lab no more than 30 percent of what is billed to Medicare. This is referred to as the "70/30 rule."

23

Aurora now listed on the Tesis website revealed that this location was an office in which I observed computers, computer monitors, employees, and what appeared to be laboratory equipment within the office space.

36.     Shull reported that each genetic sample was sent to Claro with a medical requisition form or letter of medical necessity (the doctor's order) purporting to authorize the test. Claro provided the requisition forms to be completed. Shull reported that he obtained a signature purporting to authorize the "medical necessity" for the genetic test in one of two ways. First, at the beginning of the genetic testing relationship between Shull and Tesis, which commenced in or around early 2020, they used telehealth companies. SHORR was Shull's primary contact with Tesis, and SHORR identified the telehealth providers for Shull to use. When using telehealth, the beneficiary was contacted regarding submission of a genetic testing sample, but the "medical necessity" came in the form of a requisition form signed off on by a telehealth doctor who had no preexisting relationship with the patient, was not treating the patient for a medical condition, and did not intend to treat the patient going forward. Shull reported that the parties moved away from the telehealth model to a "doctor chase" model in or around July 2020. Under the "doctor chase" model, the call center employees would get the beneficiary to identify their primary care physician. The call center would then reach out to the medical office of the primary care physician, either (1) through a telephone call and using a "script," explaining that the physician's patient was "requesting" a test that is covered by insurance but just required the physician to sign off on the test, or (2) simply sending a form for signature to the physician's office, hoping the physician would simply sign the form without question.

24

37.    Shull and his company, SCG, contracted with Tesis labs to solicit and refer beneficiaries to the labs for genetic testing. Shull provided, among other documents, six contracts between Shull and the Tesis entities, which were identified as "Marketing Business Services Agreements" between SCG and either Claro Scientific Laboratories or Alliance DX, LLC. The agreements were signed by Shull between March 25, 2020, and July 7, 2021. The contracts provided for payment to SCG of a specified amount each month (between $100,000 and $150,000, depending on the contract) in exchange for SCG's provision of "marketing and business services" to the lab.

38.    According to Shull, the contracts were structured with the intent to appear legal on their face, providing for payment of a "flat fee" in exchange for marketing and business services. But the documents and information provided by Shull, as well as other evidence located during the investigation, indicates that the real arrangement between Shull and Tesis, as well as other marketers and Tesis, was for compensation on the volume and value of referrals (i.e., each genetic test), an unlawful kickback, rather than for services provided.

39.    For example, the subjects exchanged e-mails regarding the volume of swabs being submitted and the number of genetic tests successfully paid for by Medicare, as well as structuring the arrangement between the lab and marketers based on volume and value of the number of tests referred and paid for:

a.    On June 2, 2020, from his Tesis e-mail account, KING e-mailed Shull, SHORR, and an employee listed as the Executive Assistant for Tesis, with the subject line of "Volume," and stated, "Can you please provide me a current volume for Todd [Shull]'s group. Thanks. Ron."

25

b.      On July 16, 2020, Shull e-mailed SHORR with the subject line "SCG / New Contract." Although the existing contract was based on a flat rate for hourly marketing services, Shull e-mailed SHORR that the "Total count should be 146 if this last fedex actually does get picked up. Can you please make sure we can get a wire out early tomorrow for the balance? Whether it's 45 or 46." Shull provided wire instructions to pay Sunrise Consulting Group, then stated, "Also, are we then going to initiate a new contract with SCG? Let me know because everything is set up already." Shull and SHORR are discussing the number of swabs sent (via FedEx) from beneficiaries Shull recruited to Tesis and getting paid for the "balance"—that is, the total number of swabs submitted. When asked about this text message in an interview, Shull stated these swabs were provided during a "ramp up" period in which SHORR/Claro was evaluating the volume of referrals Shull could send to Tesis in order to determine a compensation under a flat rate agreement.

c.      The next day, on July 17, 2020, Shull and Shorr continued the discussion of switching to a new contract via text message. These text messages discuss moving to the "PCP" (primary care physician) or doctor-chase model. Shull stated that on a "new/revised/restructured contract whichever is allowed I was wanting to move to 50 per month for pcp." I understand based on investigation that the "50 per month" refers to the number of swabs submitted and paid for, even though the contracts continue to discuss compensation for "business and marketing services." During this text exchange between Shull and SHORR, discussing payment, Shull texts, "If he's going off the contract then

26

it's technically already broken bc of not following the safe harbor.[2] So it would be better to just get the wire today for balance and then decide how to figure out PCP. And Claro reqs are already being faxed out so I just want to figure it out which I know we can." The "he" referred to is KING. The wire for the "balance" appears to refer back to the conversation from the day before, seeking compensation on a per-test basis.

d.      That same day, July 17, 2020, Shull e-mailed SHORR and KING. SHORR wrote, "Ron: It would be greatly appreciated if we could get paid today. Fortunately, it would work within the language of the contract if that's the concern." That same day, KING responded from his Tesis account, "Todd, I [sic] happy to send over a payment at the end of this month for the 31st.  I would not be able to do this today, I know you and Adam have had conversations in regards to payment schedules and have worked this out. I can possibly pay it earlier than the 31st but I would not be able to do that today.  [. . .] Thanks.  Ron." On July 31, 2020, KING initiated a $35,000 wire to Sunrise Consulting from Claro's bank account.

e.      On August 3, 2020, SHORR e-mailed Shull and KING at his Tesis account with the subject line of "Contract changes moving forward," and stated, "Ron, I

---

[2] The law provides "safe harbors" that permit a provider of medical services to engage third-parties for service contracts and pay for those services under specified, limited circumstances. The safe harbor applicable to personal services contracts provides that unlawful remuneration does not include payment to an agent when, inter alia, "The methodology for determining the compensation paid to the agent over the term of the agreement is set in advance, is consistent with fair market value in arm's-length transactions, and is not determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties for which payment may be made in whole or in part under Medicare, Medicaid, or other Federal health care programs." 42 C.F.R. § 1001.952(d)(iv).

have copied Todd Shull to discuss making progress towards a second contract. I know you have a good idea on how to structure it so it is equitable for both sides. Do you want to discuss here, or simply send changes over for Todd's review? Sincerely, Adam Shorr."

       f.      On February 4, 2021, Shull e-mailed KING, copying Shorr. Shull again discussed the volume of samples with KING, writing, "Thanks again for your time on the phone yesterday. In regards to the Sunrise Consulting Group numbers, I understand you believe our volume is off for both December and January." The same day, Shull texted Shorr requesting an update on wire transfer payment he was expecting. Shorr replied to Shull, "I don't think he's going to wire you because you were short the last month and then this month you weren't quite halfway there, which means there's a lot to make up. You can't go by the gross number submitted you have to go by the numbers that actually process [sic]. The numbers are very far off. If it was anywhere close I know he wouldn't say anything." Shull asks what he is supposed to do. Shorr says "Have to catch up at least in reasonable range." The reference to being "short" and not quite "halfway there" refers to the number of genetic swabs submitted and processed. When Shull states that "you can't go by the gross number submitted," he is referring to the total number of samples sent to the lab for testing. What counts, per the text message, is the number of swabs "processed," meaning swabs on which tests were run and insurance had paid for.

       g.      Approximately one month later, on March 5, 2021, Shull texted SHORR to ask if everything is good with the wires. SHORR replied, "He said you had 39 deals for the month. Not even half. Was hoping he would pay you this time and not next time.

He wanted to do the opposite." It is believed "he" referred to in these text messages is KING.

h.      On March 8, 2021, SHORR sent an e-mail to ROITER (at vicr@rokocompany.com) that appears to be a message from a third party copied and pasted into an e-mail. The message stated that the "rejections" had been addressed and that he should share this information with "Ron and Victor, along with our balance summary showing $108k pending balance, makes it clear that there should be no payment delay or payment reduction and that the 50k overdue to us should be processed."

i.      On or about June 30, 2021, Shull and SHORR texted regarding setting up a new contract. SHORR texted Shull: "Will send you a gram and by the close of business today. Remember we can make one change during the year, but think about if you want me to plug in the exact numbers we talked about yesterday." Shull responded, "We just have to figure out the math so all deals that are ahead get credited to new contract." SHORR responds, "Right." Shull replied, "I'll send some Excel sheets so we can figure it out. Wont be hard. Ahead on Claro by 65 for May/June combined minus however many aren't good and ahead on Alliance 45 for June minus whatever isn't good. So if we start new contract on Claro starting at say 60 and starting Alliance new contract at say 40 that's all I'm trying to accomplish so we know where the beginning are so it won't be zero." This conversation shows the parties discussing the number of swabs submitted monthly and whether, in essence, Shull met the quota set out as the basis for the flat fee contract. The fact that Shull had submitted more than required meant he was "ahead," and

the parties were discussing how to credit Shull for those swabs, compensating therefore based on volume and value of tests, rather than for any services provided.

       j.      On March 22, 2022, an undercover agent ("UC") called ROITER on his cell phone at 908-770-0398.  During the call, the UC advised ROITER that he owned a marketing company involved in doing PGx and CGx testing. ROITER asked where his patients were located and they discussed which Medicare jurisdictions covered those regions. ROITER asked the UC if the lab the UC's marketing company had a percentage-based agreement [paying the marketing company a percentage of insurance reimbursements on each test]. ROITER advised the UC that percentage-based agreements are an EKRA violation. ROITER said his lab agreements are written differently, and they do not write percentage-based agreements. ROITER stated he writes agreements with a flat rate "based upon a discussion we have." ROITER said the contract would include a monthly rate, and that he could "always scale it up" but did not like to scale the number down. To pay more, and increase the flat rate set in one contract, ROITER stated that he could provide the UC with three different contracts with three different labs because, while the labs were under the same names for ownership, they all had three different National Provider Identifier numbers (NPIs).[3] ROITER advised that this would allow for possible patient growth by the UC's company. ROITER asked the UC what types of tests his company was looking for; based upon that, he said he could "easily" put some numbers together. ROITER advised that his lab worked with approximately thirty

---

[3] An NPI is a unique identification number for covered health care providers.

marketing companies and that he offers those companies the same reimbursement rate for tests. ROITER advised the UC that his lab will bill commercial insurance companies and that he knows which companies will pay for genetic testing and which ones will not. ROITER advised the UC that he would send the UC an e-mail with a list of tests his lab was involved with, along with requisition forms used by his labs. ROITER advised the UC that his labs do CGx, PGx, immuno-deficiency and "ortho" testing. ROITER told the UC his lab would pay $500 for each PGx test, $1,500 per CGx test, and $1,200 per "ortho" and immune deficiency tests. ROITER advised the UC that "this is the flat rate scenario." ROITER told the UC that medical necessity paperwork was important for billing and that it was important for tests to be processed with adequate medical necessity paperwork. ROITER stated his lab provides medical necessity training to marketing companies so they know what his lab expects. ROITER stated his lab will also train doctors' offices in medical necessity so they know what his lab expects and what is needed. On March 23, 2022, the UC received an e-mail from an individual identified as the Digital Marketing Manager for Tesis Biosciences, and copied on the e-mail was vroiter@tesisbiosciences.com. Attached to the e-mail were four brochures for the following tests; CGX, PGX, Orthopedic Wounds Pathogens Panel, and Immunodeficiency.

40.    Evidence indicates that the subjects also created sham invoices that purported to bill for "marketing and business" services to match the amounts provided for in contracts and conceal the true arrangement between the marketer and the lab. Shull confirmed this was the case, as reflected in invoices he created and sent to Shull for submission to KING. On September

14, 2020, SHORR sent Shull an e-mail with the subject line "sample." The e-mail attached a scanned document that was an Invoice from a marketing company, the name of which was crossed out with pen, and showing hours billed for "Advertising and Consulting," "Marketing Services," and "Customer Service." On September 18, 2020, Shull e-mailed SHORR an invoice in identical format as the "sample" sent to him on September 14. The hours listed for each task on the invoice were different than what was listed on the "sample," but the categories and format were the same. The invoice total was for $25,500. Shull asked SHORR in the text of the e-mail, "Let me know if this is sufficient." Although the invoice was structured in terms of hours billed for services, the evidence indicates invoice was calculated to back into the amount owed for the volume of tests agreed upon. On October 2, 2020, KING initiated a $25,500 wire to Sunrise Consulting from Claro's bank account. Shull and SHORR repeated this process one month later. On October 15, 2020, Shull e-mailed SHORR. The subject of the e-mail was "SCG.Claro.Invoice.0002." In the e-mail, Shull wrote, "Adam: Everything set for tomorrow based on these numbers?" Attached within the e-mail was an invoice from Sunrise Consulting Group, LLC, attention "Ron King" with the project title "Advertising Marketing." The invoice was for consulting and marketing services at an hourly rate of $250.00 and totaled $82,500.00. Shull reported that KING was responsible for issuing payments to SCG. On October 15, 2022, King initiated a $82,500 wire to Sunrise Consulting from Claro's bank account.

41.     Documents obtained from a search warrant served on Yahoo! for SHORR's e-mail account reveal Shull also forwarded invoices to KING from other marketers he worked with,[4] including, for example, the following:

a.     On July 29, 2020, SHORR e-mailed Joseph ("Joey") Zoccali, who operated Fast Flow Marketing, explaining how to edit an invoice that had been sent to SHORR. The Invoice listed "Marketing Services", a "QTY" of 35.20 at a "Rate" of "250.00", total "balance due" of $8,800. SHORR stated Zoccali should change the "activity" description to list a few services, and asked him to send the invoice to him to review, and from then n he "can just send direct to Ron, and in near future our CFO." SHORR stated that the invoice should be for approx. 32 hours from that billing week.. might be for 40 if you are charging 200/hr."

b.     On September 9, 2020, SHORR forwarded KING an invoice from Fast Flow Marketing, "Attn: Ron King" for "Advertising and Consulting", "Marketing Services" and "Customer Service" at an "hourly rate" of $185 and a total of $44,770.

c.     On September 15, 2020, KING e-mailed SHORR and asked him to send "all invoices" to a specific employee "and cc Victor and myself going forward. I'm trying to keep the marketers pay away from Lab staff . . ., it tends to lead in discussions on peoples pay etc."

d.     On October 19, 2020, SHORR forwarded an invoice from Total Marketing Concepts, Inc., addressed to KING, for "Advertising and Consulting", "Marketing

---

[4] Shull reported that he knew Tesis worked with several other marketing companies, but he was not familiar with what tactics they used.

33

Services" and "Customer Inquiries" a "rate" of $50 to $100 and an invoice total of $9,700.

   e.  On October 19, 2020, SHORR forwarded an invoice for Claro Labs from First Alert Diagnostics, Inc. to KING. The invoice billed for "Services Provided from 9/1/20-9/30/20." The invoice billed for "Marketing and Advertising", "Data Entry Hours", "Verification", and "Customer Service", totaling $11,150.

   f.  On October 22, 2020, SHORR forwarded KING an invoice from marketing company I-Vision Media Corp. The invoice was addressed to "Attn: Ron King" and listed services for "Advertising and Consulting", "Marketing Services" and "Customer Inquiries" with a "unit price" of $150 to $100 per line item and an invoice total of $1900.

   g.  On December 30, 2020, SHORR forwarded KING an e-mail from W.G. at "Elderly Care Marketing," stating that, "Due to the holiday my company Elderly care marketing worked less hours this pay period". Attached to the e-mail was an invoice to "Claro Labs" for $20,596.05 for 49.18 hours of "Advertising and consulting", 54.05 hours of "Marketing and Services", and 8.10 hours of "Customer Service" at a rate of $185.

42.  The documents and information also evidence the scheme to solicit beneficiaries for tests not covered by Medicare and Colorado Medicaid. Evidence shows non-medical call center or other marketing individuals solicited personal health information from beneficiaries to identify purported "health conditions" and assign diagnostic codes that purported to justify medical necessity of tests. The "medical necessity" paperwork was created by marketers based

on information solicited in a phone call, and the tests were not ordered by a physician treating the patient for a medical condition. Rather, marketing companies paid telehealth providers for signatures on requisition forms or engaged in "doctor chase" to attempt to get a signature on the requisition form.

      a.     On February 20, 2020, SHORR forwarded Shull an e-mail from KING at his BrightDrive e-mail account with attachment "cardio.JPG." The attachment was a "Laboratory Request" form that listed "Patient's Personal & Family History of Cardiac Conditions." This information was to be collected by the call center to include on the medical requisition form to attempt to justify the test.

      b.     On April 13, 2020, a BrightDrive employee e-mailed ROITER, copying KING at his BrightDrive e-mail account. The e-mail attached the "list of ICD10 codes for CGX, PGX, and Cardiac." ICD-10 codes are diagnosis codes that had to be identified for the beneficiary and submitted with the requisition for the genetic test. Medical professionals assign diagnostic codes to patients, but these codes were being sent to marketing companies.

      c.     Also April 7, 2020, SHORR forwarded Shull and his associate information "from Tina" [Wellman] consisting of cancer susceptibility ICD-10 codes, "suggested" cardiomyopathy ID-10 codes, "suggested" pharmacogenetic ICD-10 codes, CGx "suggested" ICD-10 codes "UPDATED" and "Suggested Common Cancer Symptoms Codes," all on BrightDrive letterhead.

      d.     On April 13, 2020, a BrightDrive employee emailed ROITER, Wellman, and KING a "list of ICD10 codes for CGX, PGX AND CARDIOVASCULAR," which

- -

ROITER forwarded to SHORR with instructions to "Share this with your guys…" SHORR forwarded it to Shull.

      e.      On April 7, 2020, SHORR emailed a telehealth company employee introducing Shull and his associates, stating that they "are doing marketing for Ron King with Claro Laboratory… He recently signed a contract with [owner's] Telehealth firm, and I wanted to take the time to integrate them with you so they could start bringing patients over to your firm…" The owner responded to arrange a conference call, stating, "The Telehealth company works with labs, but our contracts are with the marketing companies and not with the labs." The owner then sent a "Broker Agreement" to the marketing company to contract for the telehealth services.

      f.      In May 2020, SHORR e-mailed KING information on the "ownership structure" of a second telehealth company that Shull used with beneficiaries solicited by the Florida call center for Tesis.

      g.      Some of the top referring providers as reported in Medicare data for genetic testing claims submitted from Claro and Alliance have also been identified as working for telehealth companies. Based on my experience and investigation, telehealth providers were not treating beneficiaries for medical conditions, as corroborated through hotline complaints received and witness interviews conducted during the investigation.

      h.      Bank records reflect that payments were made to telehealth companies from Tesis, Alliance, and Claro accounts in October and November 2021. Additionally, 303 Diagnostics, LLC, a laboratory entity it appears Tesis acquired, paid a telehealth

company in November 2021.[5]  Other marketing companies that did business with Tesis

(that Tesis paid) and for which the United States has access to bank records show that

those marketing companies have also paid telehealth companies, including Fastflow

Marketing, PF Consultants, and Lettusworks.

      i.      HHS-OIG has received multiple hotline complaints regarding the "doctor

chase" process. A complaint submitted by a physician on September 25, 2020, stated the

following: "My patient was called multiple times on her home phone soliciting genetic

laboratory tests. She refused services and did not give out any of her personal

information. This company, Claro Laboratory, somehow obtained her information and

information that I am her primary physician and faxed a lab order to my office. I verified

with the patient that she did not request any testing and did not give out any personal

information including her physician's information." In another example, on June 13,

2022, a Medicare beneficiary reported that her benefits summary showed that Alliance

DX LLC and Kingdom HLTH Lab LLC submitted claims and totaling $11,082 and were

paid $2,143.60 for multiple genetic testing codes with a date of service in January 2022.

The complainant stated she had never heard of any of the companies and had not received

---

[5] On January 12, 2021, KING used his Tesis e-mail account to e-mail Tesis's bank to request that 303 Diagnostics be put on the same online banking platform as the other Tesis accounts. The online banking platform allows businesses to access multiple business accounts on a single platform by a single user. In or about November 2021, CMS notified 303 Diagnostics, via letter to its Authorized Official, that it had approved its Change of Information Application. By this application, 303 Diagnostics updated its Enrollment Application Contact Person to be an employee of BrightDrive HCS. As of April 2022, 303 Diagnostics had not submitted any claims to Medicare. However, the bank account King controls for 303 Diagnostics receives funds from other Tesis accounts, and payments are made from a 303 Diagnostics account to telehealth companies.

the tests and procedures. She stated that the referring provider identified for the claims is her primary care physician, but she does not believe he referred it. (She had not contacted her physician at the time of the report).

43.    Bank records indicate that KING, along with others, maintained financial control of Tesis funds, including money in various accounts assigned to Tesis, Claro, Alliance, and other related company bank accounts. KING maintained access to all of the Tesis entity bank accounts as an "Administrator" through an online platform made available by the bank, which allowed KING to log in and see all accounts in one place and complete transactions. Bank records show KING accessed the accounts and issued or approved payments via the internet. The records show that he also occasionally accessed the online banking platform from a mobile application (an "app"), most recently in January 2022.

44.    Bank records show the receipt of Medicare and Medicaid funds by Tesis entities and the disposition of those funds. Funds are transferred from the Tesis accounts to numerous companies, some of which are owned by the Tesis principals or those affiliated with them, including the following (all amounts based on records available to date):

Funds transferred to entities associated with SHORR:

| Account Name | Account ending in | Bank | Amount from Tesis entities | Time Period |
|---|---|---|---|---|
| A and E Czech Enterprises LLC (signor Erika Shorr) | 6572 | JPMorgan Chase | $320,835 | 1/1/20 – 4/30/22 |
| A and E Czech Enterprises LLC (signor Erika Shorr) | 6275 | JPMorgan Chase | $1,133,394 | 5/4/20 – 4/30/22 |
| | | **TOTAL** | $1,454,229 | |

38

Funds transferred to entities associated with KING:

| Account Name | Account ending in | Bank | Amount from Tesis entities | Time Period |
|---|---|---|---|---|
| Kingship Consulting LLC (signor KING) | 8965 | Northway Bank | $32,000 | 1/1/20 – 4/30/22 |
| Paid from PF Consultants LLC #5207[6] to KING entity | 8965 | Northway Bank | $188,000 | 1/4/21 – 10/4/22 (account closed) |
| Vytal Healthcare Solutions LLC (signor KING) | 8089 | BOKF | $1,547,202 | 5/19/21 – 4/29/22 |
|  |  | **TOTAL** | $1,767,202 |  |

Funds transferred to entities associated with ROITER:

| Account Name | Account ending in | Bank | Amount from Tesis entities | Time Period |
|---|---|---|---|---|
| Redstone Consulting LLC (signor ROITER) | 9113 | JPMorgan Chase | $ 267,315 | 1/1/20 – 10/6/21 (account closed) |
| Redstone Consulting LLC[7] | 6971 | Citibank | $ 1,333,035 | October 2021 – 3/31/22 |

---

[6] Philip Visicaro is the signor on the account of PF Consultants LLC #5207. Funds from Tesis entities that were deposited into the PF Consultants LLC account #5207 totaled over $2,000,000 between January 4, 2021, and October 4, 2022, when the account was closed. Deposits from Tesis entities in the account comprise 85% of all deposits into this account. Funds were distributed from this PF Consultants account to ROITER, Kingship Consulting LLC, Tikor Group LLC (associated with ROITER), Tikor Marketing LLC (Vilson Kolaj/Victor Roiter), Tina Wellman, and others, including as set forth in the charts herein.  The amount shown in each chart is the total of payments from the PF Consultants account to entities related to that individual only. So, here, the payments identified are from PF Consultants to KING entity Kingship Consulting.

[7] Payments to this Redstone Consulting account were identified form Tesis bank records. The government awaits records from Citibank for this account, so signor is currently unknown.

| | | | | |
|---|---|---|---|---|
| Rook LLC (signors ROITER and Kolaj) | 5202 | JPMorgan Chase | $ 2,989,300 | 8/20/20 – 10/6/21 (account closed) |
| Tikor Marketing LLC (signor ROITER 11/12/20 – 2/17/21, and Kolaj) | 5627 | JPMorgan Chase | $ 519,825 | 1/1/20 – 1/31/22 |
| PF Consultants LLC | 5207 | JPMorgan Chase | $ 197,383 | 1/4/21 – 10/4/22 (account closed) |
| PF Consultants LLC[8] | 5321 | Bank of America | $ 194,000 | 9/22/21 – 3/1/22 |
| Tikor Group LLC[9] | 3582 | JPMorgan Chase | $ 61,800 | 8/18/20 – 9/15/21 (account closed) |
| | | **TOTAL** | $ 5,562,658 | |

Funds transferred to entities associated with Wellman:

| Account Name | Account ending in | Bank | Amount from Tesis entities | Time Period |
|---|---|---|---|---|
| Valley Vantage Consulting LLC | 6747 | Bank of Richmondville | $ 1,981,943 | 1/1/20 – 2/28/22 |
| Bright Drive HCS LLC | 2223 | NBT Bank | $ 459,652 | 5/6/20 – 3/31/22 |

---

[8] Philip Visicaro is the signor on the account of PF Consultants LLC #5321. Deposits from Tesis entities comprise 96% of all deposits into this account (from account opening September 22, 2021, through March 1, 2022). Funds from Tesis entities that were deposited into the PF Consultants LLC account #5321 totaled $646,400 between September 22, 2021, and March 1, 2022. These funds were distributed between ROITER, Wellman, Tikor Group LLC (Olga Tikhomirova, believed to reside with ROITER), and others, including as set forth in the charts herein. The amount shown in each chart is the total of payments from the PF Consultants account to entities related to that individual only.

[9] Olga Tikhomirova is the sole signor on the account Tikor Group LLC. Funds from the Tesis entities that were deposited into the Tikor Group LLC account #3582 total $1,125,000 between August 18, 2020, and September 15, 2021, when the account was closed. These funds would be distributed between ROITER, Pop Gun Marketing LLC (Parker King) and EGR Consulting LLC (Ethan Roiter). The amount shown in the chart above is the total payments to ROITER only.

40

| Bright Drive HCS LLC | 5191 | Bank of Richmondville | $ 19,046 | 1/1/20 – 3/15/22 |
|---|---|---|---|---|
| Tina Wellman | 4630 | NBT Bank | $ 7,526 | 7/23/20 – 3/15/22 |
| PF Consultants LLC | 5207 | JPMorgan Chase | $ 308,933 | 1/4/21 – 10/4/22 (account closed) |
| PF Consultants LLC | 5321 | Bank of America | $ 92,630 | 9/22/21 – 3/1/22 |
| | | **TOTAL** | $ 2,869,730 | |

### Wireless Provider Location Information

45.     In my training and experience, I have learned that T-Mobile and Verizon Wireless are companies that provide cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including E-911 Phase II data, also known as GPS data or latitude-longitude data and cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

46.     Based on my training and experience, I know that cellular telephone providers can collect E-911 Phase II data about the location of the Target Cell Phones, including by initiating a signal to determine the location of the Target Cell Phones on their respective networks or with such other reference points as may be reasonably available.

47.     Based on my training and experience, I know that T-Mobile and Verizon Wireless can collect cell-site data about the Target Cell Phone. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as T-Mobile and Verizon Wireless typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

48.     Based on my training and experience, I know that Verizon Wireless can collect per-call measurement data, which Verizon also refers to as the "real-time tool" (RTT). RTT data estimates the approximate distance of the cellular device from a cellular tower based upon the speed with which signals travel between the device and the tower. This information can be used to estimate an approximate location range that is more precise than typical cell-site data.

49.     Based on my training and experience, I know each cellular device has one or more unique identifiers embedded inside it. Depending on the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms,

42

including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number

("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a

Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International

Mobile Subscriber Identifier ("IMSI"), or an International Mobile Equipment Identity ("IMEI").

The unique identifiers, as transmitted from a cellular device to a cellular antenna or tower, can be

recorded by pen-trap devices and indicate the identity of the cellular device making the

communication without revealing the communication's content.

50.    Based on my training and experience, I know that wireless providers such as T-

Mobile and Verizon Wireless typically collect and retain information about their subscribers in

their normal course of business. This information can include basic personal information about

the subscriber, such as name and address, and the method(s) of payment (such as credit card

account number) provided by the subscriber to pay for wireless communication service. I also

know that wireless providers such as T-Mobile and Verizon Wireless typically collect and retain

information about their subscribers' use of the wireless service, such as records about calls or

other communications sent or received by a particular device and other transactional records, in

their normal course of business. In my training and experience, this information may constitute

evidence of the crimes under investigation because the information can be used to identify the

phones' user or users and may assist in the identification of co-conspirators and/or victims.

## **AUTHORIZATION REQUEST**

51.    Based on the foregoing, I request that the Court issue the proposed search

warrants, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41. The

proposed warrants will also function as pen register orders under 18 U.S.C. § 3123 authorizing

the installation and use of a pen register and/or trap and trace device to record, decode, and/or capture certain information in Attachment A for each communication to or from the Target Cell phones, without geographic limit, for a period of thirty (30) days pursuant to 18 U.S.C. § 3123(c)(1).

52.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing each warrant to delay notice until September 5, 2022. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the Target Cell Phones would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrants, the proposed search warrants do not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrants authorize the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above.  *See* 18 U.S.C. § 3103a(b)(2).

53.     I further request that the Court direct T-Mobile and Verizon Wireless to disclose to the government any information described in Attachment B that is within the possession, custody, or control of T-Mobile and Verizon Wireless. I also request that the Court direct T-Mobile and Verizon Wireless to furnish the government all information, facilities, and technical

44

assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with the provider's services, including by initiating a signal to determine the location of the Target Cell Phone on T-Mobile or Verizon's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government.

54.    I further request that this Court order T-Mobile and Verizon Wireless not to notify the subscribers of the existence of the warrants; the requested warrants relate to an ongoing operation with participants located across the United States. The subjects of the investigation have received significant funds from the scheme. Should the investigation be disclosed to any of the individuals being investigated, it is likely that they would conceal or destroy evidence, attempt to hide proceeds of the offense, change their patterns of behavior, attempt to influence witnesses, and potentially flee the jurisdiction of the United States.

55.    I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the Target Cell Phone outside of daytime hours. Because the warrants will be served on T-Mobile and Verizon Wireless, who will then compile and/or initiate production of the requested records at a time convenient to it, execution of the warrants after 10:00 p.m. and before 6:00 a.m. will not cause any greater intrusion upon the subject of investigation than will be caused by execution during daytime hours.

56.    I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be restricted until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of

the targets of the investigation. Accordingly, there is good cause to restrict these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully Submitted,

s/ Cory Rumple
CORY RUMPLE
Special Agent
Department of Health and Human Services
Office of the Inspector General

Submitted, attested to, and acknowledged by reliable electronic means on this ___23rd___ day of June, 2022.

THE HON. KRISTEN L. MIX
UNITED STATES MAGISTRATE JUDGE

**Reviewed and submitted by Assistant United States Attorney Anna Edgar.**

**To ensure technical compliance with 18 U.S.C. §§ 3121-3127, the warrant will also function as a pen register order. I, Anna Edgar, thus certify that the information likely to be obtained is relevant to an ongoing criminal investigation conducted by the above agency. *See* 18 U.S.C. §§ 3122(b), 3123(b).**

46